IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THOMAS BONTEMPO, individually and on )
behalf of a class of similarly situated persons, )
               Plaintiff, )
                                                 )
              vs                               ) Civil Action No. 06-745
                                                 )
WOLPOFF & ABRAMSON, )
               Defendant. )

REPORT AND RECOMMENDATION

I. <u>Recommendation</u>:

      It is respectfully recommended that the plaintiff's motion for class certification (Document No. 45) be denied.

II. <u>Report</u>:

      Presently before the Court is a motion for class certification submitted by the plaintiff, Thomas Bontempo. For reasons discussed below, the plaintiff's motion for class certification should be denied.

      Plaintiff Thomas Bontempo, individually, and on behalf of all others similarly situated, has filed an amended class action complaint, alleging that defendant Wolpoff & Abramson ("W&A") violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, et seq. ("FDCPA"). The plaintiff complains that W&A violated the FDCPA by

> us[ing] false, deceptive or misleading means in connection
> with the collection of debts by utilizing a method for assessing
> its attorneys' fees against Plaintiffs that was not authorized by
> contract or law and by misrepresenting the debts allegedly
> owed in state court complaints by failing to disclose or making
> misleading statements about the amount or method of determining

their attorneys' fees.[1]

It is alleged in the amended complaint that numerous residents of Pennsylvania entered into standard form credit card agreements with MBNA America Bank, N.A. ("MBNA"); that many residents of Pennsylvania subsequently defaulted on those agreements; and that MBNA's standard form credit card agreements provide in pertinent part:

> **When We May Require Immediate Payment**
>
> If you are in default, we can require immediate payment of your total outstanding balance and, unless prohibited by applicable law and except as otherwise provided under the *Arbitration and Litigation* section of this Agreement, we can also require you to pay the costs we incur in any collection proceeding, as well as reasonable attorneys' fees if we refer your account for collection to an attorney who is not our salaried employee...

The plaintiff avers that after a Pennsylvania resident defaults under the MBNA agreements, MBNA's standard practice is to appoint W&A as their outside counsel to pursue debt collection.

The plaintiff contends that in the course of collecting on the defaulted MBNA agreements, W&A's practice is not to abide by the above contract proviso concerning the payment of reasonable attorneys' fees; that instead, "W&A abrogates [the MBNA agreement] and implements a procedure to collect attorneys fees which is not based on an attorney's time

---

[1]. See, amended complaint at ¶ 1. The original complaint against W&A was filed by plaintiffs Thomas Bontempo and Terry Monteleone on behalf of themselves and all others similarly situated. W&A moved for summary judgment on the original complaint, and in an Order dated May 2, 2007, the Court granted in part and denied in part W&A's motion for summary judgment. On July 13, 2007, the plaintiffs moved for leave to amend the complaint on grounds that representative plaintiff Terry Monteleone no longer wished to pursue the matter, and the proposed amended complaint provided greater detail on claims which remained viable following the Court's Order of May 2, 2007. In a text Order dated July 16, 2007, the Court granted the plaintiffs' motion for leave to amend the complaint. On July 17, 2007, Thomas Bontempo filed his amended complaint.

actually expended, but on a percentage of the total amount of the debt"; and that W&A assess as fees "15% of the outstanding principal balance without regard to... the actual time spent [by its attorneys] on the collection efforts."[2]

The plaintiff also complains that in filing state court complaints on the defaulted agreements, W&A "misrepresents the character, amount or legal status of the debts alleged in the complaints" by asserting that MBNA is entitled to recover a sum certain on the remaining balance due and owing, which includes the principal amount of the debt, all arbitration fees incurred, interest on the debt and attorneys' fees, whereupon it fails to disclose and/or misrepresents the manner in which it calculates the assessment of attorneys' fees.[3] Based on these alleged acts, the plaintiff contends that W&A used unfair means to collect debts in violation of 15 U.S.C. §§ 1692f and 1692f(1) (Count I) and made false or misleading representations in connection with the collection of debts in violation of 15 U.S.C. §§ 1692e, 1692e(2)(A)&(B), and 1692e(10) (Count II). The plaintiff seeks actual damages, statutory damages, and a declaration that W&A's debt collection practices violate the FDCPA. The Court's jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331 and 1337.

In his motion for class certification, the plaintiff seeks to certify a Class identified as the "Attorney Fee Provision Class", as well as a Sub-Class of plaintiffs identified as the "State Court Complaint Class". The "Attorney Fee Provision Class" consists of:

> All natural persons with addresses in the Commonwealth of Pennsylvania who entered into consumer credit card agreements with MBNA America Bank, as to whom Wolpoff & Abramson

---

2. See, amended complaint at ¶¶ 11-13.

3. Id. at ¶¶ 14-15.

undertook collection by mailing correspondence or filing suit
and against whom Wolpoff & Abramson charged or collected
attorneys' fees in connection with the collection of a debt for
personal, family or household purposes on or after one year
prior to the filing of this action.

The "State Court Complaint Class" includes:

> All natural persons with addresses in the Commonwealth of
> Pennsylvania who entered into consumer credit card agreements
> with MBNA America Bank against whom Wolpoff & Abramson
> filed a complaint in a Pennsylvania Common Pleas Court on or
> after one year prior to the filing of this action.

The plaintiff moves to certify the proposed classes pursuant to F.R.Civ.P. 23(a) and 23(b)(1), 23(b)(2) and 23(b)(3). A hearing on the plaintiff's motion for class certification was held before the undersigned on October 31, 2007.

A district court has discretion under Rule 23 to certify a class. Beck v. Maximus, Inc., 457 F.3d 291, 297 (3d Cir. 2006). Before a suit may be certified as a class action, all four requirements of Rule 23(a), and one subsection of Rule 23(b) must be satisfied. Stewart v. Abraham, 275 F.3d 220, 226 (3d Cir. 2001). The Third Circuit Court of Appeals has explained:

> Rule 23 is designed to assure that courts will identify
> the common interests of class members and evaluate
> the named plaintiff's and counsel's ability to fairly and
> adequately protect class interests.

In Re Prudential Ins. Co. Sales Litigation, 148 F.3d 283, 308 (3d Cir. 1998).

Under Rule 23(a), the prerequisites to maintaining a class action are: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative party are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interest of the class.

W&A does not dispute that the numerosity requirement of Rule 23(a)(1) is satisfied. The numerosity requirement of Rule 23(a)(1) demands that the class be so large that joinder of all members is impracticable. In Re Prudential Sales Litigation, 148 F.3d at 309. The Third Circuit Court of Appeals has stated: "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." Stewart, 275 F.3d at 226-27. As gleaned at the hearing on the plaintiff's motion for class certification, there are more that 2,000 members of the proposed classes. Since it would be impractical and inconvenient to join thousands of plaintiffs, the numerosity requirement is satisfied.

In opposing class certification under Rule 23(a), W&A argues that the proposed classes cannot meet the prerequisites of Rules 23(a)(2), 23(a)(3) and 23(b)(4). As discussed below, we believe that the proposed classes satisfy the requirements of Rules 23(a)(2) and 23(a)(3); however, we agree that certification is inappropriate under Rule 23(a)(4).

Rule 23(a)(2) requires that questions of law or fact be common to the class. "A finding of commonality does not require that all class members share identical claims, and indeed factual differences among the claims of the putative class members do not defeat certification." In Re Prudential Sales Litigation, 148 F.3d at 310. Rather, the commonality requirement is satisfied "if the named plaintiff[ ] share[s] at least one question of fact or law with the grievances of the prospective class." Id.

Here, the crux of the plaintiff's claims is that W&A violated the FDCPA by utilizing a method for assessing attorneys fees against proposed class members that was not authorized by MBNA's agreements, and in state court complaints, it misrepresented the debts

allegedly owed on the amount of its fees or the method of determining them. These claims -- as shared by proposed class members -- are based on such common facts and legal questions as: whether the MBNA agreements authorize W&A to assess attorneys' fees as a percentage of the outstanding amount owed, rather than upon the lodestar method of determining attorneys' fees; whether the state court complaints filed by W&A misrepresent the proper method for calculating attorneys fees to be assessed against proposed class members; and whether W&A's complained-of acts violate the FDCPA. Thus, we find that Rule 23(a)(2)'s commonality requirement is met.

Rule 23(a)(3) mandates that the claims or defenses of the representative plaintiff be typical of the claims or defenses of the class. Under Rule 23(a)(3)'s typicality inquiry, we assess "whether the interests of the named plaintiff[ ] align[s] with the interests of the absent members." Stewart, 275 F.3d at 227. "To evaluate typicality, we ask whether the named plaintiff['s] claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiff[ ] are aligned with those of the class." Beck, 457 F.3d at 295-296.

W&A argues that the claims of plaintiff Bontempo are not typical of those of absent class members for these reasons: (1) he is subject to unique defenses that would become the major focus of the litigation; and (2) he seeks damages which are unique to him.

"[U]nique defenses bear on both the typicality and adequacy of a class representative." Beck, supra, 457 F.3d at 296 (citing cases). In Beck, the Third Circuit Court of Appeals explained: "the challenge presented by a defense unique to a class representative [is that] the representative's interests might not be aligned with those of the class, and the representative might devote time and effort to the defense at the expense of issues that are common and controlling for the class." Id. at 297. Thus, "[a] proposed class representative is neither typical

nor adequate if the representative is subject to a unique defense that is likely to become a major focus of the litigation." Id. at 301. Importantly however,

> [t]o defeat class certification, a defendant must show some degree of likelihood a unique defense will play a significant role at trial. If a court determines an asserted defense has no merit, the defense will not preclude class certification.

Id. at 300.

W&A insists that Bontempo is subject to several unique defenses that would become the major focus of this case, including issue preclusion, estoppel, and the Rooker-Feldman doctrine. We disagree.

W&A previously raised the defense of issue preclusion in its motion for summary judgment on the original complaint as to former plaintiff Terry Monteleone. The Court rejected that defense in a Report and Recommendation dated March 27, 2007, which was adopted as the Court's opinion in an Order dated May 2, 2007. W&A now argues that plaintiff Bontempo is subject to the defense of issue preclusion because state court complaints filed against him to recover amounts due under his defaulted credit card agreements have been reduced to judgment, and in three of the four cases, the state court awarded the exact amount of attorneys' fees that W&A sought when it filed suit. Thus, W&A asserts that Bontempo is collaterally estopped from arguing it violated the FDCPA by misrepresenting the amounts of his debts, including costs for reasonable attorneys' fees.

Issue preclusion, also known as direct or collateral estoppel, refers to "the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided." Migra v. Warren City School Dist. Bd. of Ed., 465 U.S. 75, 77 n.1 (1984). To determine the preclusive effect of Bontempo's prior state court suits, we look to the law of the adjudicating state, which

was Pennsylvania. See, Greenleaf v. Garlock, Inc., 174 F.3d 352, 357 (3d Cir. 1999).

Under Pennsylvania law, collateral estoppel will bar a subsequent suit if: (1) an issue decided in a prior action is identical to one presented in a later suit; (2) the prior action resulted in a final judgment on the merits; (3) the party against whom collateral estoppel is asserted was a party to the prior action, or is in privity with a party to that action; and (4) the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior suit. Jones v. UPS, 214 F.3d 402, 405 (3d Cir. 2000); Rue v. K-Mart Corp., 713 A.2d 82, 84 (Pa. 1998). Here, the defense of collateral estoppel or issue preclusion does not bar Bontempo's present claims. That is because the issues raised in the amended complaint concerning W&A's alleged violations of the FDCPA were neither decided in the state court suits, nor litigated there.

There is also no merit to W&A's assertion that Bontempo is subject to estoppel defenses which are unique to him because -- as discussed more fully below -- he engaged in a fraudulent scheme to eliminate his credit card debts with MBNA. The doctrine of equitable estoppel "acts to preclude one from doing an act differently than the manner in which another was induced by word or deed to expect." Zitelli v. Dermatology Education and Research Foundation, 633 A.2d 134, 139 (Pa. 1993). In Zitelli, the Court explained:

> [Estoppel] arises when one by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts.

Id. Stated differently, "equitable estoppel recognizes that an informal promise implied by one's words, deeds or representations which leads another to rely justifiably thereon to his own injury or

detriment may be enforced in equity." Kreutzer v. Monterey County Herald Co., 747 A.2d 358, 361 (Pa. 2000). Here, W&A has failed to show that Bontempo misled it when he engaged in his scheme to eliminate his credit card debts, or that it relied to its detriment on his acts. Thus, Bontempo is not subject to an estoppel defense that is likely to be a major focus of the litigation.

In addition, Bontempo is not subject to the Rooker-Feldman doctrine. Under the Rooker-Feldman doctrine, federal district courts lack subject matter jurisdiction to review state court adjudications or evaluate constitutional claims that are "inextricably intertwined" with the state court's decision. Guarino v. Larsen, 11 F.3d 1151, 1156 (3d Cir. 1993), citing District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 483 n.16 (1983) and Rooker v. Fidelity Trust Co., 263 U.S. 413, 414 (1923). The Third Circuit Court of Appeals has explained:

> [A] claim is barred by Rooker-Feldman under two circumstances: first, if the federal claim was actually litigated in state court prior to the filing of the federal action or, second, if the federal claim is inextricably intertwined with the state adjudication, meaning that federal relief can only be predicated upon a conviction that the state court was wrong. In either case, Rooker-Feldman bars a litigant's federal claims and divests the District Court of subject matter jurisdiction over those claims.

Walker v. Horn, 385 F.3d 321, 329 (3d Cir. 2004) (citation omitted).

"[T]he Rooker-Feldman doctrine prohibits District Courts from adjudicating actions in which the relief requested requires determining whether the state court's decision is wrong or voiding the state court's ruling." Id.; also see, Whiteford v. Reed, 155 F.3d 671, 674 (3d Cir. 1998) ("Rooker-Feldman precludes a federal action if the relief requested in the federal action would effectively reverse the state decision or void its ruling"). Here, in the state court suits brought against Bontempo to collect on his credit card debts, the court never decided the issue of

whether W&A's collection activities violated the FDCPA. To the extent the plaintiff prevails on his federal claims against W&A in this forum, the state court judgments against Bontempo for defaulting on his credit card debts will not be void. Thus, the Rooker-Feldman doctrine does not preclude class certification.

W&A also argues that Bontempo has unique damages which are not typical of absent class members, as he testified that his damages in this case include the face amount of state court judgments entered against him in favor of MBNA and mental anguish damages he suffered due to W&A's failure to respond to his letters and phone messages it left for him.[4] In response to this argument, Bontempo avers that notwithstanding his deposition testimony, his "request for relief" in the amended complaint sets forth the requisite damages he seeks in this case, namely: "judgment in favor of the Plaintiff Classes, and against W&A, for actual damages, statutory damages, costs and reasonable attorney fees as provided by § 1692k(a) of the FDCPA." See, amended complaint.

Under Rule 23(a)(3), the typicality requirement is met if a plaintiff's claim arises from the same event or course of conduct which gives rise to the claims of other class members and is based on the same legal theory. Eisenberg v. Gagnon, 766 F.2d 770, 786 (3d Cir. 1985), cert. denied, 474 U.S. 946 (1985). "Cases challenging the same unlawful conduct which affects both the named plaintiff[ ] and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims." Stewart, 275 F.3d at 227. Here, since the plaintiff's FDCPA claims arise from the same alleged misconduct and are based on the same legal theories as those of the class members, the typicality requirement is met.

---

4. See, plaintiff's deposition at pp. 220, 222-226.

Rule 23(a)(4) requires that the representative party will fairly and adequately protect the interests of the class. To determine if a plaintiff can adequately represent the class under Rule 23(a)(4), we assess the following factors: (1) "the interests of the named plaintiff[ ] must be sufficiently aligned with those of the absentees", and (2) "class counsel must be qualified and must serve the interests of the entire class." Georgine v. Amchem Products, 83 F.3d 610, 630 (3d Cir. 1996) (emphasis in original), aff'd., 521 U.S. 591 (1997). In addition, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." Amchem Products, Inc.v. Windsor, 521 U.S. 591, 625-26 (1997).

With respect to class counsel, W&A conceded at the hearing that the representing attorneys are qualified and will serve the interests of all class members. Conversely, W&A insists that plaintiff Bontempo will not adequately serve the interests of the classes, because: (1) his credibility is suspect, as evidenced by his fraudulent scheme to avoid his MBNA debts, and (2) his interests are not the same as other class members, as he seeks to eliminate the state court judgments against him and the debts he owes to MBNA.

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." Amchem Products, 521 U.S. at 625. In each case, a court must undertake a "stringent examination of the adequacy of class representation". In re Fine Paper Antitrust Litigation, 617 F.2d 22, 27 (3d Cir. 1980).

In judging the adequacy of a class representative, "courts may consider the honesty and trustworthiness of the named plaintiff." Savino v. Computer Credit, Inc., 164 F.3d 81, 87 (2d Cir. 1998); also see, Hoffman Elec., Inc. v. Emerson Elec. Co. 754 F.Supp. 1070, 1076 (W.D.Pa. 1991) (recognizing that "the credibility of a plaintiff may be considered by the trial judge in

determining the plaintiff's adequacy as a class representative"). "Problems of credibility, when sufficiently serious, can prevent a named plaintiff from being certified as a class representative." Weikel v. Tower Semiconductor LTD, 183 F.R.D. 377, 397 (D.N.J. 1998), citing Panzirer v. Wolf, 663 F.2d 365, 368 (2d Cir. 1981), vacated on other grounds, 459 U.S. 1027 (1982).

W&A argues that Bontempo's credibility and integrity are impaired, as evidenced by his fraudulent scheme to eliminate his MBNA credit card debts and his less than forthright testimony when questioned about it. The record shows that Bontempo entered into four standard form credit card agreements with MBNA, each of which contained an arbitration clause which provided that any claim or dispute arising from, or relating to their agreement, would be resolved by binding arbitration conducted by the National Arbitration Forum ("NAF").

When Bontempo was unable to pay his credit card debts under the agreements, which were in excess of $50,000, he accessed internet web sites under the search term "debt problems". There, he obtained forms, documents and information which he used in an effort to eliminate his MBNA credit card debts. For instance, in June 2004, Bontempo sent several letters to MBNA, as well as a purported settlement agreement between them, the contents of which he got from internet sites and unnamed sources. One of those letters, dated June 30, 2004, was titled "Notice of Intent to Tender Partial Payment and Other Consideration as Satisfaction in Full", in which Bontempo informed MBNA that "[t]here is a good faith dispute on this account in that you sincerely believe I owe you a balance and I sincerely believe that the balance I owe you is zero, [and] that you owe me money".[5] When asked at his deposition what money he believed MBNA

---

5. See, Exhibit 3 to W&A's brief opposing class certification.

owed him, Bontempo retorted: "I don't know what my thought process was"[6]; indeed, Bontempo admitted he had no right to a refund on his account.[7] Also in that letter, Bontempo informed MBNA that "[y]ou waive all further claims against me with respect to the Account..." When asked the meaning of this phrase at his deposition, Bontempo stated: "I'm not sure what I was saying there."[8]

Bontempo also sent a document to MBNA by certified mail dated June 30, 2004 titled "Settlement Agreement between Thomas Bontempo and MBNA", in which he reiterated that "[t]here was a good faith dispute on this account", as he owed "zero" to MBNA, but it owed money to him, and that MBNA agrees to "waive all further claims against me with respect to the Account".[9] In his purported settlement agreement, Bontempo informed MBNA that he will present a check to it "as nominal consideration", and as "primary consideration", he will waive his rights "to any refund" and his rights to sue it, and that MBNA's acceptance of said consideration will be deemed "payment in full for the Account". Bontempo's purported settlement agreement also included an arbitration provision, in which he informed MBNA that any dispute between them involving their credit card agreements would be resolved by "binding arbitration at the National Arbitration Council or Blue Ridge Arbitration"[10], even though his credit card agreements with MBNA specified that their disputes would be arbitrated by the NAF.

---

6. See, plaintiff's deposition at p. 115.

7. Id. at p. 117.

8. Id. at pp. 122-123.

9. See, Exhibit 4 to W&A's brief opposing class certification.

10. Id.

13

Bontempo sent a check to MBNA for one of his accounts in the amount of $25.00 dated July 7, 2004.[11] When asked about the check at his deposition, Bontempo testified that his intent was to have MBNA deposit the check, which he believed would nullify his debt on that account, which was in excess of $10,000.[12] Bontempo also sent nominal checks to MBNA on two of his other credit card accounts[13], and in a letter dated October 8, 2004, Bontempo thanked MBNA "for accepting my notice of final payments for [the] account[s]."[14]

Thereafter, Bontempo obtained arbitration awards from Blue Ridge Arbitration dated March 31, 2005 on several of his credit card accounts, copies of which were sent to MBNA.[15] The purported Blue Ridge Arbitration awards decreed that Bontempo did not have to pay any sums to MBNA, and that his defaulted accounts with it were "settled in full".[16] Bontempo did not know what authority Blue Ridge Arbitration had to issue its awards[17]; and by virtue of his agreements with MBNA, it had no such authority. Bontempo testified that the purpose of the Blue Ridge Arbitration awards was to impair MBNA's ability to collect on his credit card accounts.[18]

---

11. See, Exhibit 5 to W&A's brief opposing class certification.
12. See, plaintiff's deposition at p. 145.
13. Id. at p. 150.
14. See, Exhibit 6 to W&A's brief opposing class certification.
15. See, Exhibits 7-8 to W&A's brief opposing class certification.
16. Id.
17. See, plaintiff's deposition at p. 159.
18. Id. at p. 161.

MBNA filed suit in the United States District Court for the Western District of North Carolina seeking a permanent injunction against Blue Ridge Arbitration for their conduct of unauthorized arbitrations.[19] In an Order dated September 22, 2006, that Court issued an Order enjoining Blue Ridge Arbitration from conducting further arbitrations with MBNA cardholders.[20]

W&A asserts that Bontempo's aforesaid June 30, 2004 letter and proposed settlement agreement show his dishonest scheme to avoid his debts with MBNA. It avers that in submitting those documents to MBNA, Bontempo sought to create an accord and satisfaction by manufacturing a nonexistent dispute over his accounts as alleged justification for tendering less than the full balance owed. It also insists that Bontempo attempted to modify his obligation to arbitrate in the NAF -- without any legal authority -- to justify using Blue Ridge Arbitration, after which he sought to avoid his debts by procuring invalid arbitration awards from it.

Bontempo was not the only MBNA cardholder to use Blue Ridge Arbitration in an effort to eliminate his debts.[21] In the spring and summer of 2004, MBNA received letters and notices from at least nine other MBNA customers which contained the identical language appearing on Bontempos's aforesaid letters of June 30, 2004 to MBNA, and those documents were the basis upon which MBNA filed suit against Blue Ridge Arbitration in the District Court for the Western District of North Carolina.[22] Accordingly, it is revealing that when Bontempo

---

19. See, affidavit of Robert Winzinger at ¶ 8.
20. Id. at ¶ 10 and Exhibit 10 to affidavit of Robert Winzinger.
21. See, affidavit of Robert Winzinger at ¶ 9.
22. Id. at ¶¶ 7-9 and Exhibit 9 to affidavit of Robert Winzinger.

was asked at his deposition if the language used in his June 30, 2004 letters to MBNA was obtained from the Internet or was his own, Bontempo was evasive, answering as follows:

> Q. ... Whose verbiage was that, sir?
>
> A. Probably something I read.
>
> Q. It's not your words; is it?
>
> A. Some of it may be.
>
> Q. That's pretty much what you downloaded off the Internet though; isn't it?
>
> A. I don't recall.[23]

When asked if some of the verbiage in his letters was obtained from Blue Ridge Arbitration, Bontempo stated "I don't know ... it's possible."[24]

Bontempo also sent a letter sent to W&A objecting to arbitration before the NAF, wherein he falsely alleged that his signature was forged on his credit card agreements with MBNA.[25] When questioned about this at his deposition, Bontempo conceded that he signed the back of his credit cards and was not aware of anyone forging his name on them; that he never notified MBNA that there was a forgery on his account; that he was the only person who activated his MBNA credit card accounts; and that he never sent an affidavit to MBNA or a credit reporting agency asserting that there was fraud or forgery on his accounts.[26]

---

23. See, plaintiff's deposition at p. 115.
24. Id. at p. 138.
25. Id. at pp. 165-167.
26. Id.

Bontempo also sent a letter to Laura Johnson of the NAF dated August 24, 2005, stating that "[n]o arbitration agreement exists between [himself and MBNA] whatsoever".[27] When asked about this at his deposition, Bontempo stated: "I'm not sure what I was saying there."[28] In his aforesaid letter to Laura Johnson, Bontempo asked her whether W&A was "finding charge-offs while searching records and just trying to collect illegally?"[29] When asked at his deposition where he derived that accusation, Bontempo stated: "Just a thought", and he admitted he had no factual basis for accusing W&A of collecting debts illegally.[30] Bontempo also wrote in his letter to Laura Johnson that "2 [of his] cases 'heard' in your forum [i.e, NAF] are based on fraud!"[31] When asked at his deposition to explain the fraud, Bontempo stated: "I don't recall what I was referring to there exactly."[32] According to W&A, these facts demonstrate Bontempo's willingness to make false accusations to a tribunal, since NAF was the tribunal where Bontempo's arbitration cases were heard.

In a letter to MBNA dated February 24, 2006, Bontempo inquired about collection activities on one of his accounts, asking: "Did MBNA place this account with an attorney? Or, did some attorney pull my information off of some banking source or from the internet? Now, it

---

27. See, Exhibit 11 to W&A's brief opposing class certification.
28. See, plaintiff's deposition at p. 192.
29. See, Exhibit 11 to W&A's brief opposing class certification.
30. See, plaintiff's deposition at p. 196.
31. See, Exhibit 11 to W&A's brief opposing class certification.
32. See, plaintiff's deposition at pp. 199-200.

seems someone is pursuing a bogus account and using MBNA's name as authority to do so."[33] When Bontempo was asked if he thought it was proper to falsely accuse the law firm of pursuing a bogus claim in their client's name, he answered: "When I couldn't get any kind of answers."[34]

Based on Bontempo's aforesaid conduct, we agree with W&A that his credibility is seriously in doubt. A class representative may be deemed inadequate where he was "dishonest or lacked candor about matters central to the litigation itself." McCall v. Drive Financial Services, 236 F.R.D. 246, 252 (E.D.Pa. 2006), citing Kline v. Wolf, 702 F.2d 400, 401-402 (2d Cir. 1983).

Here, the claims of proposed class members emanate from their standard form credit card agreements with MBNA, where W&A is said to have violated the agreements' proviso concerning the collection of reasonable attorneys' fees. In seeking to eliminate his debts with MBNA, which underlie his FDCPA claims, Bontempo stood his credit card agreements on their head. As detailed above, Bontempo wrote letters to MBNA falsely informing it that he owed no balance on his accounts, but it owed money to him. He ignored the arbitration provision contained in his credit card agreements which specified that any dispute would be resolved by arbitration conducted by the NAF, and instead, Bontempo obtained illicit arbitration awards from Blue Ridge Arbitration, so as to impair MBNA's ability to collect on his accounts. Bontempo also sent nominal checks to MBNA in a unilateral effort to create an accord and satisfaction on his accounts. Further, when Bontempo objected to arbitration before the NAF, he sent a letter to W&A falsely alleging that his signature was forged on his credit card agreements with MBNA. Bontempo also sent a letter to the NAF, falsely informing it that no arbitration agreement existed

---

33.  See, Exhibit 12 to W&A's brief opposing class certification.

34.  See, plaintiff's deposition at p. 217.

between himself and MBNA, and he asserted, without justification, that his cases heard in its forum were based on fraud.

Bontempo's misrepresentations concerning his agreements with MBNA -- agreements that will relied upon by class members in asserting their claims against W&A -- and his dishonesty in seeking to eliminate his credit card debts that underlie his FDCPA claims, make Bontempo an inadequate class representative under Rule 23(a)(4). As W&A points out, Bontempo's aforesaid acts will undoubtedly become the focus of cross examination at trial. It also appears that Bontempo's interests may not be sufficiently aligned with those of absent class members. Bontempo testified that part of his economic damages in this case include the face amount of the judgments entered against him.[35] Based on his acts recited above, Bontempo's primary interest in this case may be to eliminate the judgments against him and his debts owed to MBNA.

Therefore, since he is not an adequate class representative, it is recommended that the plaintiff's motion for class certification (Document No. 45) be denied.

Within thirteen (13) days after being served with a copy, any party may serve and file written objections to this Report and Recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,

s/ ROBERT C. MITCHELL<br>
United States Magistrate Judge

Dated: December 13, 2007

---

[35]. Id. at pp. 220, 223.